UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JACQULYNE PERRIEN, | **DOCKET NO.: CV-21-4443** |
| Plaintiff, | **(MKB)(RML)** |
| - against - | |
| CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, DETECTIVE CHRISTOPHER MORANO, POLICE OFFICERS BRIAN ORTIZ and POLICE ORLANDO INSIGNARES in their official and individual capacities, | **SECOND AMENDED COMPLAINT** |
| Defendants. | ***Jury Trial is Demanded*** |

Plaintiff, JACQULYNE PERRIEN, her attorneys, the LAW OFFICES OF FREDERICK K. BREWINGTON, as and for her *SECOND AMENDED COMPLAINT* against the Defendant, states and alleges as follows:

## PRELIMINARY STATEMENT

1.      Prior hereto, Plaintiff filed a *Complaint* on August 6, 2021, which was amended as of right on November 4, 2011.  This is a second amendment of that *Complaint* which is done pursuant to the *Memorandum and Order* of this Court, entered September 12, 2022  by the Honorable Margo K. Brodie.

2.      This is an action for money damages against the CITY OF NEW YORK, DETECTIVE CHRISTOPHER MORANO, POLICE OFFICER BRIAN ORTIZ, and POLICE OFFICER ORLANDO INSIGNARES for committing acts under color of law and depriving Plaintiff of rights secured by the Constitution and laws of the United States and the State of New York. Plaintiff alleges that Defendants participated in the use of excessive and unreasonable force, abuse of process, failure to intervene, unlawful seizure of persons and property, denial of due process, retaliation, failure to supervise, failure to report abuse and violations of Plaintiff's rights, failure to

provide timely and adequate medical care and municipal violations upon Plaintiff, JACQULYNE PERRIEN, on October 16, 2018, and continuing to date.

3.      On October 16, 2018 and continuing to date, Defendants CITY OF NEW YORK, DETECTIVE CHRISTOPHER MORANO, POLICE OFFICERS BRIAN ORTIZ and   POLICE OFFICER INSIGNARES under color of state law, intentionally and wilfully subjected Plaintiff to, *inter alia,* use of excessive and unreasonable force, aiding and abetting the use of unreasonable force, abuse of process, failure to intervene, unlawful seizure of persons and property, denial of due process, retaliation, failure to supervise, failure to report abuse and violations of Plaintiff's rights, failure to provide timely and adequate medical care and municipal violations.

## JURISDICTION

4.      This action is brought pursuant to 42 U.S.C. § 1983, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and under the Constitution, statutes and common law of the State of New York. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 (3) and (4) and the aforementioned statutory and constitutional provisions.

5.      Venue is set within the United States District Court for the Eastern District of New York in that the Defendant CITY OF NEW YORK is located within, and the events giving rise to the claim occurred within, the boundaries of the Eastern District of New York.

## PARTIES

6.      At all times relevant hereto, Plaintiff JACQULYNE PERRIEN (hereinafter Plaintiff or MS. PERRIEN) was and is a citizen of the United States, and resided in the State of New York.

7.      At all times relevant hereto, Defendant CITY OF NEW YORK (hereinafter "CITY") is a city within the State of New York. At all times relevant hereto, Defendant CITY is responsible

2

for the maintaining, funding and operating the   New York City Police Department (hereinafter NYPD), and the functions, employees, agents and personnel within.

8.      At all times relevant hereto, Defendant DETECTIVE CHRISTOPHER MORANO (hereinafter MORANO), sued here in his individual and official capacity, was and is an employee of the NYPD, duly appointed and acting as Detective in the 105th Precinct and was an agent, servant and/or employee of the NYPD, acting in the course and scope of his employment as such and in furtherance of the interests and business of his said employer. At all times relevant hereto, MORANO was and is a state actor.

9.      At all times relevant hereto, Defendant POLICE OFFICER BRIAN ORTIZ (hereinafter "ORTIZ") sued here in his individual and official capacities, was and is an employee of the NYPD, duly appointed and acting as a Police Officer in the 105th Precinct and is an agent, servant and/or employee of the NYPD, acting in the course and scope of his employment as such and in furtherance of the interests and business of his said employer. At all times relevant hereto, Defendant ORTIZ was and is a state actor.

10.      At all times relevant hereto, Defendant POLICE OFFICER ORLANDO INSIGNARES (hereinafter "INSIGNARES"), sued here in his individual and official capacities, was and is an employee of the NYPD, duly appointed and acting as a Police Officer in the 105th Precinct and is an agent, servant and/or employee of the NYPD, acting in the course and scope of his employment as such, and in furtherance of the interests and business of their said employer. At all times relevant hereto, INSIGNARES was and is a state actor.

11.      At all times relevant hereto, the individual Defendants were acting under color of state law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of

3

Defendant CITY and of the State of New York.

## FACTUAL ALLEGATIONS

12.     On or around October 16, 2018 at 1a.m., Ms. Perrien was walking to a friend's house on 217th Street, near Springfield Boulevard and Hollis Boulevard, in Queens, NY. As she crossed from the sidewalk into the crosswalk, she was suddenly violently hit by a car and thrown to the ground.

13.     After Ms. Perrien realized that she was hit by a car and in pain, she dialed 911 on her phone, which was damaged when she was struck, for an ambulance. The ambulance arrived shortly after to render medical treatment and transport her to Jamaica Hospital.

14.     Once Ms. Perrien arrived to Jamaica Hospital at or around 2 a.m., she was placed in the emergency room. During this time, Ms. Perrien was screaming in pain and agony. In order to determine the source of her pain, the medical staff ordered X-rays of her left femur, left knee and pelvis. From the X-rays, the medical staff determined that Ms. Perrien's left femur was fractured and her pelvis was fractured in multiple places. This meant Ms. Perrien would require immediate surgery to repair her left femur, and thus the medical staff started prepping her for surgery.

15.     After the medical staff finally determined the extent of Ms. Perrien's injuries, they finally gave Ms. Perrien the strong pain medication she needed for the injuries from which she was suffering for a considerable period. Ms. Perrien also required blood transfusions which took a considerable long time for her to receive. Ms. Perrien was in and out of consciousness until her surgery because of the strong pain medication, great and increasing underlying pain and the substantial loss of blood.

16.     It is during this state of pain, medicine influence and bare consciousness that a Police Officer from the 105th Precinct entered her room. While being in and out of lucidness and preparing for massive surgery, the Police Officer intruded and asked Ms. Perrien questions for a police report. Ms. Perrien to this day does not remember what she was asked, what she said or what the Police Officer said during this police report since she was experiencing mind-bending pain and was semi-conscious at the time while getting ready for surgery.

17.     As best as she could remember, after being asked the questions by the Police Officer, the Police Officer then told Ms. Perrien that they had a warrant for her arrest. Upon information and belief, the Police Officer was charging her with disorderly conduct. The Police Officer proceeded to handcuff Ms. Perrien to her hospital bed. From what Plaintiff recalls, she had to go into surgery while being handcuffed to her bed.

18.     On or around October 16, 2018 at 9:00 p.m., Ms. Perrien then proceeded to undergo orthopedic surgery on her left femur. The surgeons placed a rod, pins and screws to repair her broken left femur. Police maintained guard over Plaintiff and she remained in their full care and custody.

19.     After Ms. Perrien made it safely out of surgery, the 105th Precinct Police Officers switched with officers of the 103rd Precinct. In keeping Plaintiff in custody and preventing her from having her liberty, upon information and belief, it was Police Officers from the 103rd Precinct who remained with Ms. Perrien during her recovery. Following her surgery, Ms. Perrien remained in Jamaica Hospital to heal and recover from her massive surgery for five days.

20.     At or around October 22, 2018 at 1:30 p.m., just over 5 days after having a rod, pins and screws placed in Ms. Perrien's leg, two Police Officers from the 105th Precinct arrived back at the hospital to take over custody of Ms. Perrien and switch with the Officers from the 103rd Precinct.

The two Police Officers told Ms. Perrien that they wanted to bring her to the 105th Precinct that very same day to process her charges. Ms. Perrien objected and made known her serious post-surgical medical condition, but her objections were ignored.

21.     When the physician from Jamaica Hospital discharged Ms. Perrien on October 22, 2018 at or around 1:30pm, they prescribed her, along with pain medicine, to do "weight bearing as tolerated" and to use a "rolling walker for ambulation."

22.     Ms. Perrien was then put in a wheelchair and wheeled to the front of the hospital by a medical staff. Seeing her obvious condition, these two Police Officers from the 105th Precinct were very courteous and helped Ms. Perrien get into the police vehicle. The Police Officers then drove Ms. Perrien to the 105th Precinct. Clearly aware of her medical condition and physical limitations, the Police Officers then physically helped Ms. Perrien get out of the police car and into the police station which was necessary due to her obvious inability to walk properly and clear level of pain she was experiencing. Ms. Perrien rendered what limited assistance she could to demonstrate her willingness to cooperate.

23.     After Ms. Perrien arrived at the 105th Precinct, the Police Officers let Ms. Perrien know that she was going to be brought to Queens Central Booking to process her charges. The same two Police Officers then brought Ms. Perrien to the front of the building to wait for the transportation van. The Police Officers, acting in a compassionate and caring fashion, even brought a chair for Ms. Perrien to sit in while she waited since they knew she could not wait for the van standing up the whole time.

24.     After waiting for some time, the transportation van finally arrived to serve as transport to Queens Central Booking. Two different Police Officers arrived with the van and were to serve

as the Officers who would take custody of Ms. Perrien. They made themselves known to Ms. Perrien

as the Officers now in charge of her custody and were Defendants ORTIZ and INSIGNARES.

Officers ORTIZ and INSIGNARES never made their names or badge numbers known to Ms.

Perrien.

25.     When Officers ORTIZ and INSIGNARES arrived in front of Ms. Perrien, they

demanded Ms. Perrien to get into the van by herself. Ms. Perrien explained that she had just

undergone surgery a few days prior and could not walk on her left leg. Ms. Perrien told Officers

ORTIZ and INSIGNARES that if they needed proof they could read her medical file.

26.     Officers ORTIZ and INSIGNARES told her that they did not believe her and

commanded her to get into the van. Ms. Perrien explained again that she could not walk on her leg

because of her injury and surgery. Officers ORTIZ and  INSIGNARES then told her that they did

not believe her because she did not have a visible cast. Ms. Perrien tried to explain that she had a rod

with pins and screws placed in her leg, but again they rejected her pleas and  information that she

supplied , and made absolutely no effort to verify Ms. Perrien's condition.

27.     Attempting to avoid causing herself danger and to prove she could not walk on both

legs, Ms. Perrien tried to hop on her good leg. This effort by Plaintiff caused her great pain, which

was obvious.  Officers ORTIZ and INSIGNARES laughed at her attempt and again told her they did

not believe her that she had a serious medical condition. Again, Ms. Perrien again implored these

law enforcement officers to look at her medical records for proof, but again they refused.

28.     Ms. Perrien repeatedly pleaded to Officers ORTIZ and INSIGNARES that she was

recovering from surgery and could not get into the van by herself. Suddenly, Officers ORTIZ and

INSIGNARES grabbed Ms. Perrien on either side of her body, lifted her up, and threw her face first

into the back of the van. Ms. Perrien went sprawling and screamed in anguish and pain as she hit the van and felt a click in her leg. Ms. Perrien immediately felt extreme pain, anger, confusion, physically and emotionally hurt, and degraded from being treated in this inhumane and abusive manner. Plaintiff then had to struggle to seat herself in the van as Defendants ORTIZ and INSIGNARES drove erratically through the streets of New York with no regard for Plaintiff.

29.     Plaintiff was not placed in a seat belt and was forced to try and hold herself upright with her hands cuffed behind her.  Defendants disregard of Plaintiff's well-being and the safety standards set in place to protect her was blatant.  As a result, Plaintiff was toss about in the van and made to suffer shocking pain over and over again from the inability to secure her body in a safe and non-painful position.   This unreasonable use of force, disregard for Plaintiff's well-being,  and abusive acts by Officers ORTIZ and INSIGNARES magnified and intensified the pain she was already feeling post-surgery and shot torturous agony up and down her leg, which reverberated through her body.

30.     In addition to injuring Ms. Perrien's healing leg, Officers ORTIZ and INSIGNARES then put a handcuffed man in the back of the van to be transported alongside Plaintiff.  Being transported alone in the back of a van with an unknown man made Ms. Perrien feel extremely uneasy, vulnerable, nervous and unsafe. She tried to reassure herself continuously by reminding herself that they were both handcuffed. Nonetheless, Ms. Perrien kept as much distance as she could between her and the male prisoner to protect herself as she was incapable of protecting herself in case anything were to happen to her.

31.     The ride to Queens Central Booking filled Ms. Perrien with pain, fear and shock that grew worse with every bump and every turn.

8

32.     Once the transportation van arrived to Queens Central Booking, Ms. Perrien was in extreme pain and in desperate need of help to get out of the van since she still could not walk on her left leg. Instead of helping her, Officers ORTIZ and INSIGNARES grabbed Ms. Perrien by the side of her arms and actually dragged her out of the van, up to the front of the building and inside. This act caused so much pain that Plaintiff continued to plead for help and mercy.

33.     Once inside the building, Officers ORTIZ and INSIGNARES continued to drag Ms. Perrien around to get her fingerprints and picture taken. Once the photos and prints were taken, Officers ORTIZ and INSIGNARES dragged Ms. Perrien to the metal detector. When Ms. Perrien hobbled through the metal detectors on her one good leg, the alarms went off. Officers ORTIZ and INSIGNARES asked Ms. Perrien if she had anything on her. Ms. Perrien explained again that she had just undergone surgery and that she had a rod, pins and screws in her left leg.

34.     It is at this point where Officers ORTIZ and INSIGNARES acknowledged the abuses and violations they had just committed. Officers ORTIZ and INSIGNARES audibly cursed when they realized Ms. Perrien was telling the truth the whole time about still recovering from massive leg surgery.   Officers ORTIZ and INSIGNARES immediate reactions to curse when they realized that they had willfully violated Plaintiff and all of the proper procedures they had violated, served to illustrate that they were aware of their wrongdoings and that such a violation was well-established. This admission demonstrated that Officers ORTIZ and  INSIGNARES knew they had committed acts that were violative of Ms. Perrien's rights and that their actions were contrary to well-established rules, regulations and law and were deliberately indifferent to Plaintiff's pain, suffering, needs and rights.

35.     Officers ORTIZ and INSIGNARES then brought Ms. Perrien to the EMT office.

When the EMT medic realized what Officers ORTIZ and INSIGNARES had done to Ms. Perrien, he yelled at them in outrage and disbelief. The EMT medic expressed his disgust of the actions of Officers ORTIZ and INSIGNARES and said he could not believe what they had done in how they abused Plaintiff.  and that he had never seen someone do something like this. There was nothing the EMT medic attempted to do to assist Plaintiff address or lessen her obvious pain,  or to provide repair or aid to the damage caused by Officers ORTIZ and INSIGNARES. Remarkably, Ms. Perrien, who was in obvious need of medical attention, was not taken to the hospital.

36.     Instead, Ms. Perrien was then placed in a small holding cell for approximately  two hours where she waited in agony, pain and misery before seeing a judge.

37.     After waiting agonizingly in the holding cell, Ms. Perrien was finally able to speak to a legal advisor and tell the advisor what happened to her and about the pain she was greatly suffering from. The legal advisor listened to Ms. Perrien. Ms. Perrien was then brought to the Queens County Criminal Court to a courtroom to be heard before a judge. Her attorney then told the judge about Ms. Perrien being fresh out of surgery and feeling pain in her leg. The judge released Ms. Perrien and agreed that they should reconvene at another time once Ms. Perrien had time to stop the pain and to heal.

38.     Despite their knowledge of Plaintiff's needs and condition, Defendants ORTIZ and INSIGNARES then grabbed Ms. Perrien's arms again and picked her up to drag her out of the courtroom. As one of  Officers ORTIZ or INSIGNARES opened the swinging door to exit the courtroom, he let it close and slam on Ms. Perrien's leg on purpose. When the door slammed on Ms. Perrien's leg, she immediately screamed in pain and agony.

39.     The Court Officer, who watched either Officer ORTIZ or INSIGNARES purposely let the door slam closed on Ms. Perrien's injured leg, immediately yelled at Officers ORTIZ and INSIGNARES to leave Ms. Perrien alone. Thus, Officers ORTIZ and INSIGNARES were forced to leave the building and instead two Court Officers took over Ms. Perrien's care for her safety.

40.     Then, the two Court Officers helped Ms. Perrien to the front of the Queens County Criminal Court building. One of the Court Officers left to call the ambulance to pick up Ms. Perrien to go back to the hospital. The ambulance then came shortly after and picked up Ms. Perrien. The ambulance brought Ms. Perrien back to Jamaica Hospital.

41.     On October 22, 2018 at or around 8:30pm, seven hours after being previously discharged the same day, Ms. Perrien arrived back at Jamaica Hospital. Ms. Perrien was in so much pain that she could not stand it or stand up at all. She felt lightheaded as though going into shock, and in-and-out of consciousness again. Ms. Perrien explained to the medical staff what had occurred to her and her leg by the Police Officers.

42.     The medical staff ordered another X-ray of her injured leg to see if anything was wrong with Ms. Perrien's leg. From the X-ray, the surgeon observed that Ms. Perrien's femur was in the "approximate alignment" that her knee and femur should be in after surgery. But since it was still too early after surgery, the surgeon said there was nothing at the moment they could do. The surgeon said that after the abuses she suffered that Ms. Perrien needed to wait and see whether it would heal properly or not, and that they could not perform surgery on her leg until one year after the earlier surgery.

43.     On October 23, 2018 at or around 6:30am, Ms. Perrien was forced to leave Jamaica Hospital in pain and without any other medical choice. This time, as part of her discharge plan, the

11

medical staff showed Ms. Perrien how to use crutches which completely relieved her injured leg from bearing weight. The medical staff also reiterated the discharge plan prescribed to her the previous day to do "weight bearing as tolerated" to the extent she was able to.

44.     During the following months, Ms. Perrien would continue to use crutches, canes and a walker to move around. She engaged in physical therapy at least twice a week for months. Despite these methods to alleviate pain in her leg, Ms. Perrien's pain in her leg was constant.

45.     Feeling constant pain and limited progress in healing, Ms. Perrien knew something was wrong with her leg and went to several hospitals for second opinions, such as Bellevue Hospital and Mount Sinai Beth Israel. But, upon information and belief, both hospitals were unwilling to perform the second surgery on her leg while it was still under one year since her earlier surgery.

46.     Still suffering pain nine months later, finally on or around July 3, 2019, Ms. Perrien went to the NYU Orthopedic Surgery Fracture Clinic. Ms. Perrien told the medical staff about the pain she had been feeling in her left thigh and knee since October 2018. The medical staff conducted diagnostic tests including an X-ray image of Ms. Perrien's left leg and knee.

47.     After reviewing the X-rays, the resident on duty asked Ms. Perrien if anything had happened for her leg not to heal. Ms. Perrien explained to the medical staff what happened to her by Officers ORTIZ and INSIGNARES five days after surgery. At that point, the resident told her that she had a non-union fracture and would most likely need a second surgery. The orthopedic surgeon was brought in, who confirmed the resident's findings and gave Ms. Perrien a consultation about the surgery. The clinic promptly scheduled Ms. Perrien's surgery for the following week.

48.     On or around July 12, 2019, Ms. Perrien returned to the NYU Clinic for her surgery. As soon as she was admitted into the hospital, she was quickly prepped for surgery. After being

12

prepped for surgery, she was brought to the surgery room for her procedure. During surgery, the surgeon removed the same previously placed hardware, surgically refractured the femur, and pinned the femur together with a new nail and two screws.

49.     Ms. Perrien was released on the same day as her surgery with instructions to again only bear weight as tolerated.

50.     After her second surgery, Ms. Perrien required massive amounts of help from her aunt to conduct her daily life. Her aunt allowed Ms. Perrien to move into her apartment so she could take care of Ms. Perrien while she recovered and learned to walk again. Ms. Perrien required help with simple everyday tasks such as, but not limited to, walking, moving, grabbing things, showering, using the bathroom and any other task which required just minimal mobility. Ms. Perrien's aunt was generous in going out of her way to help Ms. Perrien with anything she needed. Her aunt also generously paid for an orthopedic bed and shower to accommodate Ms. Perrien's handicap, and paid for her food and cab fare. It took around a year and a half for Ms. Perrien to regain a limited level of independence after her second surgery and to be able to live without her aunt's aid.

51.     As successful as a second surgery could be expected to be, Ms. Perrien has taken years to heal from the additional injury and surgery she underwent on her left leg. As a matter of fact, Ms. Perrien's left femur is still healing. She continues to this day to go to physical therapy and follow-up on doctor appointments. Even two years after her second surgery, Ms. Perrien continues to undergo MRIs to figure out options to make the pain in her leg liveable. Because of the reinjury to her left femur caused by Officers ORTIZ and INSIGNARES, Ms. Perrien ended up losing 3 centimeters of mass on her left leg.

52.     Before the car accident, on June 13, 2018, Ms. Perrien took the Fire Department of New York Exam to start her career in the Fire Department of New York. She passed the exam and it was expected of her to take the physical exam by June 2019. But due to the extensive pain she was still feeling in her left leg at that time, she was unable to take the physical exam, and missed her opportunity to be eligible for hiring by the Fire Department of New York.

53.     Later on, Ms. Perrien tried to amend and correct the report she gave to the police officer while not lucid and being in and out of consciousness at Jamaica Hospital. On October 17, 2018, because of the pain caused by Officers ORTIZ and INSIGNARES, Plaintiff was too scared to enter the Precinct. Instead, Ms. Perrien called over and over again trying to contact an Officer who would listen. She finally received an answer to her phone calls after a month of trying. The individual who answered was Officer Nicholas Lech, who rudely told Plaintiff that she could not revise or amend her report and refused to provide her any assistance.

54.     On August 5, 2020, Ms. Perrien filed a formal complaint with the New York City Police Department about her mistreatment by Defendants ORTIZ and INSIGNARES.

55.     Defendant MORANO, who was responsible for the Internal Affairs investigation into Plaintiff's abuse, was nonresponsive to Plaintiff, and closed the investigation on the grounds of "insufficient evidence" before even reviewing Plaintiff's medical records.

56.     Plaintiff exercised her due diligence in an effort to obtain the identities of the Defendant Officers.   Defendant MORANO further withheld the names of Defendants ORTIZ and INSIGNARES, despite multiple written, and verbal requests for same from Plaintiff and her attorneys.

14

57. Defendant MORANO continued to withhold this information until *Ordered* to provide this information by the Court on November 5, 2021. Conveniently for Defendants, this disclosure was not made until after the Statute of Limitations against Defendants ORTIZ and INSIGNARES had nominally expired.

58. On January 13, 2021, Plaintiff's attorney sent Defendant MORANO the requested HIPAA Authorization forms for Defendant MORANO to obtain Plaintiff's medical records.

59. On January 29, 2021, a mere sixteen (16) days after the HIPAA forms were sent to Defendant MORANO, the Internal Affairs Bureau notified Ms. Perrien that an investigation had been conducted that determined there was "insufficient evidence" to prove her complaint, and they closed the complaint file.

60. Upon information and belief, sixteen (16) days is not enough time to send HIPAA forms to hospitals and receive information back. Thus, upon information and belief, Defendant MORANO and the Internal Affairs Bureau closed the complaint file without receiving or reviewing Ms. Perrien's medical files and reviewing all of the available evidence.

## AS AND FOR COUNT ONE
## 42 U.S.C. § 1983 - EXCESSIVE AND UNREASONABLE USE OF FORCE
## FOURTH AMENDMENT

61. The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 60 of this *Second Amended Complaint* with the same force and effect as though fully set forth herein.

62. Defendants ORTIZ and INSIGNARES unlawfully and purposely seized and forcefully threw Ms. Perrien into the transportation van causing her to land on her injured leg, causing her excessive injury and pain, and deeply humiliating and frightening her by the inhumane

treatment of Defendants.

63.     Defendants ORTIZ and INSIGNARES also unlawfully and excessively seized and dragged Ms. Perrien through and around Queens Central Booking, despite being in a fragile medical condition, causing her extensive pain and mental anguish.

64.     Further, Defendants ORTIZ and INSIGNARES unlawfully and purposely seized her body and allowed the court's swinging door to slam on Ms. Perrien's left leg, causing her excessive pain and agony at the site of her recovering injuries and further mental anguish from the treatment she was repeatedly attacked with by Defendants.

65.     The excessive and unreasonable use of force, wrongful seizure and other wrongful acts conducted against Plaintiff by the Defendants ORTIZ and INSIGNARES was committed under color of law, customs, and statutes of the state of New York.

66.     Under color of law, the Defendants, and each one of them, deprived Plaintiff of her Fourth Amendment right from unlawful seizure, excessive and unreasonable use of force and authority by wrongfully throwing her into the van, dragging her around and causing a door to slam near her surgical site on purpose and in violation of 42 U.S.C. § 1983, and then abusing Plaintiff by repeatedly ignoring the pain they were causing her by making her bear weight on her injured leg and repeatedly causing further harm and pain to her surgical site.

67.     Each of the Defendants separately and in concert acted outside the scope of their jurisdiction and without authorization of law, and each of the Defendants separately and in concert acted willfully, knowingly and purposefully with the specific intent to deny Plaintiff proper and necessary medical treatment in violation of 42 U.S.C. § 1983.

68.   Due to the excessive and unreasonable force by Defendants, Plaintiff sustained physical, monetary and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental, emotional and physical harm and stress, costs of bringing suit, additional surgical procedures, impairment of self-esteem, mental health, and physical distress, and other injuries not yet fully ascertained. By reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

## AS AND FOR COUNT TWO
## 42 U.S.C. § 1983- ABUSE OF PROCESS

69.   The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 68of this *Second Amended Complaint* with the same force and effect as though fully set forth herein.

70.   The wrongful acts conducted against the Plaintiff by the Defendants ORTIZ and INSIGNARES constituted abuse of process, abuse of authority, breach of procedures, and violations of the Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. The Defendants ORTIZ and INSIGNARES negligently and recklessly breached their duty to prevent the commission of the civil rights violations perpetrated against Plaintiff MS. PERRIEN, including violations of 42 U.S.C. § 1983, and substantive and procedural due process infractions.

71.   Defendants ORTIZ and INSIGNARES committed these acts and used their access, power and authority to disregard Plaintiff's clear and known medical condition to satisfy their own abusive and sadistic purposes. They then did not report the use of force, abuses and violations they committed to Plaintiff MS. PERRIEN in an effort to evade responsibility and to cover up their

abuses.

72.     In addition, Defendants CITY and MORANO took action and abused official process against Plaintiff in refusing to properly and fully honor Plaintiff's Civilian Complaint and abuse the Internal Affairs Process by intentionally failing and refusing to properly investigate her complaints. The acts of Defendant MORANO to willfully silence her voice and otherwise punish Plaintiff for complaining about her treatment by Defendants ORTIZ and INSIGNARES were intended to deny her right to due process when Internal Affairs dismissed her complaint for "lack of sufficient evidence" despite the presence of several testimonial witnesses - the Court Officers, the EMT medic, and the Legal Aid advisor.

73.     Under color of law, said abuse of process was continued by the Defendants CITY and MORANO when said Defendants refused to adequately investigate and properly discipline Defendants ORTIZ and INSIGNARES for their actions against Plaintiff MS. PERRIEN. The Defendants CITY and MORANO  failed to properly investigate and verify the veracity of Plaintiff's claims, failed to pursue, seek, or review substantial evidence supporting MS. PERRIEN's complaint; such evidence included the Court Officers testimony, the EMT medic's testimony, the Legal Aid advisor's knowledge of events, or medical records of the worsened condition of MS. PERRIEN's leg after being in OFFICERS ORTIZ and INSIGNARES's custody and care.

74.     Due to the abuse of process by Defendants, Plaintiff sustained physical, monetary and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental,  emotional and physical harm and  stress, costs of bringing suit, additional surgical procedures, impairment of self-esteem,  mental health, and physical distress, and other injuries not yet fully ascertained. By

reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

**AS AND FOR COUNT THREE**
**42 U.S.C. § 1983- FAILURE TO INTERVENE**

75.     The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 74 of this *Second Amended Complaint* with the same force and effect as though fully set forth herein.

76.     Under color of law, Defendants, and each one of them, had knowledge of the wrongs conspired to be done against the Plaintiff, had the power to prevent or aid in preventing the commission of such violations, but neglected and/or refused to prevent such wrongful acts being committed. Instead, Defendants aided and abetted in the abuses against Plaintiff.

77.     Defendants ORTIZ and INSIGNARES have been trained by the NYPD on the proper procedures and rules of conduct while handling civilians. Defendants ORTIZ and INSIGNARES were aware of these procedures and rules when Defendants ORTIZ and INSIGNARES, without motive or reason, lifted Plaintiff off the ground, threw her into the van and caused her to land on her injured leg. It was clear that Defendants ORTIZ and INSIGNARES had caused injury to Plaintiff when she cried out in pain and complained of her leg. Both Defendants ORTIZ and INSIGNARES had the opportunity to intervene against the abusive and unreasonable acts of the other, but both failed to do so.

78.     Even after these abusive acts occurred, Defendants ORTIZ and INSIGNARES continued to fail to intervene by allowing Defendants ORTIZ and INSIGNARES to continue to abuse Plaintiff by dragging her unlawfully through Queens Central Booking and purposefully

swinging the court door on Plaintiff MS. PERRIEN's healing surgical site, and failing to report this excessive and unreasonable use of force and unlawful seizure to a supervisor or to the NYPD.

79.    Defendant ORTIZ or Defendant INSIGNARES had an opportunity to intervene at any point of said events: before, during, or after. But, neither Defendant ORTIZ nor Defendant INSIGNARES chose to intervene, and allowed this abuse, humiliation, degradation, harm and blatant violation of civil rights to occur against Plaintiff.

80.    Defendants CITY, and MORANO had the opportunity to intervene on the cover up and extension of the abusive and unreasonable acts of Defendants ORTIZ and INSIGNARES when they received the formal complaint of Plaintiff MS. PERRIEN. But Defendants CITY and MORANO failed to intervene when they closed the Internal Affairs investigation due to "insufficient evidence" despite the presence of testimonial witnesses such as the Court Officers, EMT medic, Legal Aid advisor, and the other male inmate transported in the van with Plaintiff MS. PERRIEN.

81.    Due to the failure to intervene by Defendants, Plaintiff sustained physical, monetary and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental, emotional and physical harm and stress, costs of bringing suit, additional surgical procedures, impairment of self-esteem, mental health, and physical distress, and other injuries not yet fully ascertained. By reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

**AS AND FOR COUNT FOUR**
**42 U.S.C. § 1983- UNLAWFUL SEIZURE OF PERSONS AND PROPERTY**

82.     The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 81 of this *Second Amended Complaint* with the same force and effect as though fully set forth herein.

83.     The Defendants and each of them acted under color of law to deny the Plaintiff her constitutional rights to protection from unlawful seizure of person and property under the Fourth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

84.     Under color of law, Defendants ORTIZ and INSIGNARES had no right to unreasonably and abusively grab Plaintiff MS. PERRIEN's body. Defendants ORTIZ and INSIGNARES had no right to viciously and abusively throw Plaintiff MS. PERRIEN into the van on her injured leg, not securing any form of seat restraint and otherwise disregarding Plaintiff's safety despite being told about her medical and physical condition. Defendants ORTIZ and INSIGNARES had no right to grab Plaintiff MS. PERRIEN's body and drag her around Queens Central Booking. Defendants ORTIZ and INSIGNARES had no right to commit lack of care and duty, and purposefully allow the swinging door to slam into MS. PERRIEN's injured leg. There acts were callous, calculated, wonton, and deliberately indifferent to Plaintiff's obvious and known physical and medical needs.

85.     These were acts of continued unlawful seizure of Plaintiff MS. PERRIEN's body, and contributed more harm and injury to her recovering surgical site. These acts demonstrate a lack of care or duty, and resortment to unlawful seizure of person and property in order to execute Defendant

OFFICERS ORTIZ and INSIGNARES's unlawful wishes to cause MS. PERRIEN mental and physical harm, injury, permanent detriment and pain.

86.     Due to the unlawful seizure of persons and property by Defendants, Plaintiff sustained physical, monetary and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental, emotional and physical harm and stress, costs of bringing suit, additional surgical procedures, impairment of self-esteem, mental health, and physical distress, and other injuries not yet fully ascertained. By reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

## AS AND FOR COUNT FIVE
## 42 U.S.C. § 1983- DUE PROCESS AND DENYING BODILY INTEGRITY
## FIFTH AND FOURTEENTH AMENDMENTS

87.     The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 86 of this *Second Amended Complaint* with the same force and effect as though fully set forth herein.

88.     The acts of Defendants CITY, ORTIZ and INSIGNARES in subjecting Plaintiff to abuse,  occurred without any process being afforded to Plaintiff, and she was denied any opportunities guaranteed by the Fifth and Fourteenth Amendments.

89.     Under color of law, there was no opportunity afforded to Plaintiff MS. PERRIEN to report the abuses transpired against her by Defendants ORTIZ and INSIGNARES after she was thrown into the van and caused significant injury on her leg. Even though Defendants ORTIZ's and INSIGNARES's conduct was seen and reviewed by the EMT medic, the Legal Aid advisor, the

Judge and the Court Officers, there was no avenue for due process to be afforded in response to Defendant ORTIZ's and INSIGNARES's abusive and unreasonable actions.

90.     Due to the lack of opportunity for due process, Plaintiff MS. PERRIEN had no choice but to endure the violation of her civil rights and the physical abuses of Defendants ORTIZ and INSIGNARES against her.

91.     Even after Plaintiff MS. PERRIEN reported the violations of her rights by Defendants ORTIZ and INSIGNARES to Defendants CITY and MORANO, she was still denied her right to due process when Internal Affairs dismissed her complaint for "lack of sufficient evidence" despite the presence of several testimonial witnesses - the Court Officers, the EMT medic, and the Legal Aid advisor.

92.     Due to the lack of due process by Defendants, Plaintiff sustained physical, monetary and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental, emotional and physical harm and stress, costs of bringing suit, additional surgical procedures, impairment of self-esteem, mental health, and physical distress, and other injuries not yet fully ascertained. By reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

### AS AND FOR COUNT SIX
### 42 U.S.C. § 1983 - RETALIATION

93.     The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 92 of this *Second Amended Complaint* with the same force and effect as though fully set forth herein.

94.     Under color of law, Defendants ORTIZ and INSIGNARES acted in retaliation towards Plaintiff MS. PERRIEN in violation of 42 U.S.C. § 1983.

95.     Defendants ORTIZ and INSIGNARES threw Plaintiff MS. PERRIEN into the van abusively and unreasonably in retaliation to what Defendants ORTIZ and INSIGNARES believed were lies told by Plaintiff MS. PERRIEN. In reality, Plaintiff MS. PERRIEN was telling the truth the entire time about her freshly healing injuries, as could be proven by her medical records, and could not bear weight on her healing leg because she had in fact broken her femur and underwent surgery a mere six days prior. In particular after acknowledging their mistreatment of Plaintiff and being told of the same by the EMT medic. Defendants ORTIZ and INSIGNARES did not seek medical treatment for Plaintiff, continued to force her to suffer pain, dragged her before the court and slammed a door on her injured leg.

96.     Defendants ORTIZ and INSIGNARES retaliated against Plaintiff MS. PERRIEN for allegedly "lying" about her medical condition by purposefully seizing and throwing her into the van causing pain, anguish, embarrassment and excessive harassment. Defendants ORTIZ and INSIGNARES had the opportunity to verify Plaintiff MS. PERRIEN's statements by reading her medical file, although it was not necessary to refrain from committing this abusive retaliatory act.

97.     Defendants ORTIZ and INSIGNARES retaliated against the judge's grant of freedom to Plaintiff MS. PERRIEN by purposefully allowing the swinging door to slam on her injured leg and cause her pain and anguish to the Officers' sadistic and abusive delight.

98.     Defendants ORTIZ and INSIGNARES knew or should have known that Plaintiff MS. PERRIEN was not "lying" about being fresh out of surgery. Plaintiff MS. PERRIEN demonstrated she could clearly not walk, that she was in pain, and repeatedly informed Defendants ORTIZ and

24

INSIGNARES that they could verify her injuries in her medical file if they desired. But it is clear Defendants ORTIZ and INSIGNARES wanted to cause Plaintiff more harm and unjustly retaliate against her, and chose to ignore Plaintiff's pain, anguish and pleas to stop hurting her.

99.     In addition, Defendants CITY and MORANO took retaliatory action against Plaintiff in refusing to properly and fully honor Plaintiff's Civilian Complaint and abuse the Internal Affairs Process by intentionally failing and refusing to properly investigate her complaints.  The acts of Defendant MORANO to willfully silence her voice and otherwise punish Plaintiff for complaining about her treatment by Defendants ORTIZ and INSIGNARES were intended to deny her right to due process when Internal Affairs dismissed her complaint for "lack of sufficient evidence" despite the presence of several testimonial witnesses - the Court Officers, the EMT medic, and the Legal Aid advisor.

100.    Due to acts of retaliation by Defendants, Plaintiff sustained physical, monetary and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental,  emotional and physical harm and stress, costs of bringing suit, additional surgical procedures, impairment of self-esteem, mental health, and physical distress, and other injuries not yet fully ascertained. By reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

## AS AND FOR COUNT SEVEN
## 42 U.S.C. § 1983- FAILURE TO REPORT USE OF FORCE, ABUSE AND VIOLATIONS OF PLAINTIFF'S RIGHTS

101.    The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 100 of this *Second Amended Complaint* with the same force and effect as

though fully set forth herein.

102.   Plaintiff MS. PERRIEN could not be reinjured without an intentional act of abuse of purpose.  Defendants ORTIZ and INSIGNARES acted under color of law to violate Plaintiff's rights and then failed to report the use of force, abuses and violations that Defendants ORTIZ and INSIGNARES committed.  Defendants ORTIZ and INSIGNARES did not write a report, notified a person or committed any other relevant act to report the abuses and violations of Plaintiff's rights.

103.   Defendants ORTIZ and INSIGNARES had knowledge that they were, and are, legally required to follow procedures and policies to prevent use of force, abuses and violations. Defendants ORTIZ and INSIGNARES had knowledge that illegal acts should be reported. Instead, Defendants ORTIZ and INSIGNARES were complicit and supportive of the violations of Plaintiff's civil rights, and chose for their actions to continue undisciplined, unsupervised and unreported.

104.   Due to the failure to report abuses and violations of Plaintiff's rights by Defendants, Plaintiff sustained physical, monetary and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental,  emotional and physical harm and stress, costs of bringing suit, additional surgical procedures,  impairment of self-esteem, mental health, and physical distress, and other injuries not yet fully ascertained. By reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

## AS AND FOR COUNT EIGHT
## 42 U.S.C. § 1983- FAILURE AND DELIBERATE INDIFFERENCE TO PROVIDE TIMELY AND ADEQUATE MEDICAL CARE
## FOURTEENTH AMENDMENT

105.   The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 104 of this *Second Amended Complaint* with the same force and effect as though fully set forth herein.

106.   Defendants ORTIZ and INSIGNARES were repeatedly verbally foretold that Plaintiff MS. PERRIEN was healing from surgery and could not walk properly. Defendants ORTIZ and INSIGNARES decided to ignore this information, neglect to check Plaintiff's medical record and repeatedly denied Plaintiff Ms. PERRIEN timely and adequate medical care while in their custody.

107.   Defendants ORTIZ and INSIGNARES could reasonably infer from Plaintiff's cry when she was thrown into the van that Defendants ORTIZ and INSIGNARES had caused further injury to Plaintiff. Yet, Defendants ignored Plaintiff's painful scream and did not seek to provide her adequate medical care for the injuries Defendants had caused her.

108.   Defendants ORTIZ and INSIGNARES could also reasonably infer that Plaintiff was telling the truth of being unable to bear weight on her injured leg by her clear inability to walk on both legs. But, Defendants ORTIZ and INSIGNARES ignored Plaintiff MS. PERRIEN's injuries and demanded her to walk by herself. When Plaintiff MS. PERRIEN clearly could not, Defendants ORTIZ and INSIGNARES dragged her around Queens Central Booking without any care for her medical condition or medical needs.

109.   Defendants ORTIZ and INSIGNARES purposefully and intentionally caused Plaintiff more pain and in need of more medical attention when they allowed the court door to swing on her.

This was done with full knowledge of Plaintiff MS. PERRIEN's recent surgery and recovery, and yet Defendants ORTIZ and INSIGNARES proceeded to perform this abusive act and cause Plaintiff to require even more medical care and attention that Defendants still did not provide to her.

110. By the time OFFICERS ORTIZ and INSIGNARES had performed all of these intentionally abusive acts on Plaintiff MS. PERRIEN, she was in so much pain and agony that she had to be returned to the hospital for further medical care. Although the medical staff could not ascertain immediately the extent of the damage caused to Plaintiff MS. PERRIEN, the constant pain over months and the necessary second surgery to realign the damage done by Defendants ORTIZ and INSIGNARES demonstrates the extreme lack of medical care and attention by Defendants ORTIZ and INSIGNARES when they caused her reinjury.

111. Due to Defendants' deliberate indifference to Plaintiff's known and clear medical needs and failure to provide timely and adequate medical care, Plaintiff sustained physical, monetary and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental, emotional and physical harm and stress, costs of bringing suit, additional surgical procedures, impairment of self-esteem, mental health, and physical distress, and other injuries not yet fully ascertained. By reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

## AS AND FOR COUNT NINE
## 42 U.S.C. § 1983- MUNICIPAL VIOLATIONS

112. The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 111of this *Second Amended Complaint* with the same force and effect as

though fully set forth herein.

113.     Defendant CITY knew or should have known of its employees', agents', or servants' propensity to engage in the illegal and wrongful acts detailed above.

114.     Prior to October 16, 2018, Defendant CITY developed and maintained policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons in Defendant CITY's custody, which policies and/or customs caused the violation of Plaintiff MS. PERRIEN's rights. Upon information and belief, it was the policy and/or custom of Defendant CITY to improperly and inadequately investigate Police Officer misconduct, and acts of misconduct were instead tolerated by Defendant CITY, including, but not limited to incidents where Defendants have in the past abused and mistreated civilians while being in their custody.  The following matters[1] and legal claims are examples of instances where Police Officer misconduct violated the constitutional rights of persons in their custody which ended in settlements or verdict in favor of the Plaintiffs. Such acts remain ongoing, and have not been addressed by the City of New York in any meaningful way:

| INDEX/DOCKET NO. | PARTIES | VERDICT | SETTLEMENT | CAUSE OF ACTION* |
|---|---|---|---|---|
| 030675/2017E (Bnx) | Ahmed v. City of N.Y. | | $15,000.00 | E/F; M/P; A/B; F/A |
| 523863/2017 (Bnx) | Al-Qadffi v. City of N.Y. | | $15,000.00 | A/B; M/P |
| 500893/2018 (Kg) | Alvarez v. City of N.Y. | | $30,000.00 | A/B; N/P; F/A |
| 021956/2018E (Bx) | Anderson v. City of N.Y. | $129,187.50 | | E/F; A/B; F/A |
| 021310/2018E (Bx) | K.Aponte v. City of N.Y. | | $20,000.00 | A/B; M/P; F/A |

---

[1]  The list provided here is just a small sample of cases commenced in New York State Court, which are known and documented by the City of New York by the New York City Law Department in their report of NYPD Alleged Misconduct Matters Commenced in CY 2017 – CY 2021 as of: 01/31/2022 Mandatory Reporting per NYC Admin Code §7-114 (previously Int. No. 119-D)

| | | | |
|---|---|---|---|
| 021128/2018E (Kg) | T. Aponte v. City of N.Y. | | $30,000.00 | E/F; A/B; F/A |
| 518288/2016 (Kg) | Bailey v. Vincenzo | | $10,000.00 | A/B; M/P; F/A |
| 026921/2017E (Bnx) | Blake v. City of N.Y. | | $25,000.00 | E/F; A/B; F/A |
| 022740/2018E (Bnx) | Blige v. City of N.Y. | | $30,000.00 | E/F; M/P; F/A |
| 300108/2017 (Bnx) | Bonilla v. City of N.Y. | | $75,000.00 | A/B; M/P; F/A |
| 021708/2018E (Bnx) | Bosques v. City of N.Y. | | $12,500.00 | E/F; A/B; F/A |
| 706588/2017 (Qn) | Bowes v. City of N.Y. | | $35,000.00 | E/F; A/B; F/A |
| 023609/2018 (Bnx) | Briscoe v. City of N.Y. | | $40,000.00 | E/F; M/P; F/A |
| 024853/2017E (Bnx) | Brown v. City of N.Y. | | $6,000.00 | A/B; F/A |
| 517727/2017 (Kng) | Browning v. City of N.Y. | | $75,000.00 | E/F; F/A |
| 021534/2018E (Bnx) | Bryant v. City of N.Y. | | $37,500.00 | A/B; M/P; F/A |
| 523191/2016 (Kng) | Burgess v. City of N.Y. | | $72,500.00 | E/F; M/P; F/A |
| 156209/2017 (NY) | Burke v. City of N.Y. | | $27,500.00 | A/B; F/A |
| 020940/2018E (Bnx) | Calix v. City of N.Y. | | $175,000.00 | E/F; A/B; F/A |
| 300014/2007E (Bnx) | K. Caraballo v. City of N.Y. | | $30,000.00 | A/B; M/P; F/A |
| 030863/2017E (Bnx) | M. Caraballo v. City of N.Y. | | $100,000.00 | A/B; M/P; F/A |
| 300917/2017 (Bnx) | Cardona v. City of N.Y. | | $110,000.00 | A/B; M/P; F/A |
| 025730/2017E (Bnx) | Catala v. City of N.Y. | | $60,000.00 | A/B; F/A |
| 021156/2017E (Bnx) | Chapman v. City of N.Y. | | $55,000.00 | A/B; M/P; F/A |
| 021400/2018E (Bnx) | Coats v. City of N.Y. | | $30,000.00 | A/B; M/P |
| 027680/2016E (Bnx) | Cole v. City of N.Y. | | $ 3,500.00 | A/B; M/P; F/A |
| 714922/2016 (Qn) | Coleman v. City of N.Y. | | $12,500.00 | A/B; F/A |
| 000156/2017 (Qn) | Collazo v. City of N.Y. | | $15,000.00 | A/B |
| 501521/2017 (Kng) | G. Colon v. City of N.Y. | | $60,000.00 | A/B; F/A |
| 021786/2017E (Bnx) | M. Colon v. City of N.Y. | | $27,500.00 | A/B; N/P; F/A |
| 025599/2018E (Bnx) | M Colon v. City of N.Y. | | $27,500.00 | E/F; F/A |
| 021455/2018E (Bnx) | Contreras v. City of N.Y. | | $50,000.00 | A/B; M/P; F/A |
| 300492/2017 (Bnx) | Copeland v. City of N.Y. | | $10,000.00 | A/B; M/P; F/A |
| 717627/2017 (Qn) | B. Cruz v. City of N.Y. | | $15,000.00 | E/F |
| 02967/2017 (Bnx) | J. Cruz v. City of N.Y. | $67,838.75 | | E/F; A/B; M/P; F/A |

| 031791/2017E (Bnx) | M. Cruz v. City of N.Y. | | $27,500.00 | A/B; F/A |
| 703349/2017 (Qn) | R. Cruz v. City of N.Y. | | $70,000.00 | A/B; F/A; M/P |
| 022471/2018E (Bnx) | R. Cruz v. City of N.Y. | | $52,500.00 | E/F; A/B; F/A |
| 030892/2017E (Bnx) | Cyrus v. City of N.Y. | | $90,000.00 | E/F; A/B; M/P; F/A |
| 031298/2017E | Czubak v. City of N.Y. | | $95,000.00 | E/F; A/B; M/P; F/A |
| 160896/2016 | Dalmida v. City of N.Y. | | $3,500.00 | A/B; F/A |

**\*Key:**   **E/F: Excessive Use of Force**
**A/B: Assault and Battery**
**M/P: Malicious Prosecution**
**F/A: False Arrest**

115.    The City of New York was and is mandated to document, report and properly identify acts of alleged Police misconduct, including use of force, assault/battery, malicious prosecution and false arrest/imprisonment pursuant to New York Administrative Code §7-114.  That section states in relevant part that:

§ 7-114 Civil actions regarding the police department and covered individuals.

b.  No later than January 31, 2018 and no later than each July 31 and January 31 thereafter, the law department shall post on its website, and provide notice of such posting to the individual responsible for implementing the duties set forth in paragraph one of subdivision c of section 803 of the charter, the comptroller, the police department, the civilian complaint review board, and the commission to combat police corruption the following information regarding civil actions filed in local, state or federal court against the police department or a covered individual, or both, resulting from allegations of improper police conduct, including, but not limited to, claims involving the use of force, assault and battery, malicious prosecution, false arrest or imprisonment, or deprivation of a right pursuant to chapter 8 of title 8:

1.    a list of civil actions filed against the police department or a covered individual, or both, during the five-year period preceding each January 1 or July 1 immediately preceding each report;

2.    for each such action: (i) the identities of the plaintiffs and defendants; (ii) the court in which the action was filed; (iii) the name of the law firm representing the plaintiff; (iv) the name of the law firm or agency representing each defendant; (v) the date the action was filed; and (vi) whether the plaintiff alleged improper police conduct, including, but not limited to, claims involving use of force, assault and

31

battery, malicious prosecution, false arrest or imprisonment, or deprivation of a right pursuant to chapter 8 of title 8; and

3.   if an action has been resolved: (i)  the  date  on which it was resolved; (ii) the manner in which it was resolved; and (iii) whether the resolution included a payment to the plaintiff by the city,  or  by a covered individual or an employer or other person paying on behalf of a covered individual, and, if so, the amount of such payment.

116.   In its report of 399 pages,  dated January 31, 2022, which was allegedly issued pursuant to this section,  upon  information  and  belief,  Defendant CITY  failed  to  meet  its  full obligation and failed to provide any listing of deprivations of rights other than "use of force, assault and battery, malicious prosecution, false arrest or imprisonment."  Defendant CITY did not provide any listing of alleged unlawful search and seizure or failure to intervene, both of which are claimed by Plaintiff in the instant case.

117.   This systematic and ongoing practice is made more troubling by the repeated failure of Defendant City to provide, except in just a few cases [2],  reporting of  "use of force" or "assault and battery" in the Federal cases reported in the nearly 400 pages  and approximately 16,000 cases listed throughout the report.

118.   A random spot check of several Federal cases that concluded in verdicts or settlement in favor the Plaintiffs demonstrates that the Defendant CITY has, as a policy failed, with few exceptions[3],  to fully and properly report claims of use of force, assault, battery in any of the Federal

[2] Of the Federal cases, based on a review of the 399 pages of the report of NYPD Alleged Misconduct Matters Commenced in CY 2017 – CY 2021 as of: 01/31/2022 Mandatory Reporting per NYC Admin Code §7-114 (previously Int. No. 119-D), only a total of 14 appear to report either "use of force" or "assault and battery".

[3] Based on a review of the 399 pages of the report of NYPD Alleged Misconduct Matters Commenced in CY 2017 – CY 2021 as of: 01/31/2022 Mandatory Reporting per NYC Admin Code §7-114 (previously Int. No. 119-D) the number of Federal cases listed that concluded in settlements or verdicts that reported either the use of force or assault and battery is just 9 cases.

cases documented, and has failed to provide information or report any claims of failure to intervene and unlawful search and seizure in any of the cases which are included in the report.

119.    While the CITY alleges that it paid $30,000 in a settlement in the matter of Jennifer *Padilla v. City of New York*, *et al.* Docket # 19-CV-03703 (E.D.N.Y.) it fails to list any information about what are the underlying allegations.  The same is true of *Amir Padmore v. City of New York, et al.* Docket # 20-CV-01372 (E.D.N.Y.) in which a settlement is reported of $30,000. These cases represent the troubling rule and practice which has been adopted by Defendant CITY.

120.    In the *Padilla* matter, it was alleged that while Plaintiff was sitting in the passenger's side of a legally parked automobile, members of the NYPD approached the car, and ordered Ms. Padilla out of the car.  The allegations include that the officers took her into custody charging her with various felonies. At the moment of her arrest, Ms. Padilla informed Defendant officers that she was a diabetic and uses a pump to regulate her insulin level.

121.    None the less, the allegations included that officers confiscated her medication and refused to allow her to administer the insulin to herself.  Later that evening Ms. Padilla was taken to Central Booking, where the screener noticed that she was suffering from diabetic complications. The officers were ordered that Ms. Padilla be returned to the 63rd Pct.  With her hand cuffed behind her, when placing Ms. Padilla in the automobile the officers failed to seatbelt her. The police vehicle was involved in a collision, and Ms. Padilla was seriously injured.

122.    It was further alleged that Defendant officers failed to call an ambulance to the scene, and failed to provide any medical treatment to Ms. Padilla. By refusing to provide Ms. Padilla with access to her insulin, Defendants were deliberately indifferent to Ms. Padilla's health. By failing to seatbelt her when putting her in their car, Defendants were deliberately indifferent to Ms. Padilla's

safety.   This case, which bears allegations that have overlapping similarities to those of Ms. Perrien would clearly serve to place Defendant CITY on notice that a concern about how officers treated a person in need of attention to her medical needs and other concerns.

123.    In the *Padmore* matter, Mr. Padmore was participating in the annual West Indian Day Parade, and was riding one of the floats.  He descended from that float and began walking in the opposite direction towards another float. It is alleged that as he walked, one of the New York Police Officers saw Mr. Padmore, walking against traffic and told him not to do so.

124.    The Plaintiff alleged that when Mr. Padmore attempted to explain that he was walking to another float, the Officer put his hand on Mr. Padmore's chest.  Mr. Padmore stepped back, and turned around to walk in the direction as instructed by the officer. It is alleged that at that time, two additional officers approached Mr. Padmore.  As Mr. Padmore began walking away, he stumbled, then one of the officers tackled Mr. Padmore to the ground, and the other two officers also piled on top of him.  Mr. Padmore was beaten about this face and body, taken to the precinct, held for several hours, given a desk appearance ticket, and released.

125.    The facts asserted by Plaintiff included that when Mr. Padmore's mother observed her son's physical condition, they immediately returned to the precinct to file an excessive force complaint. While there, the officer who initiated the contact, and assault upon Mr. Padmore aggressively approached him, but was restrained by other officers.  As Mr. Padmore and his mother waited for the paperwork relating to his excessive force complaint, Mr. Padmore was again approached by several officers, including the Officer who initiated the assault upon Mr. Padmore, and again arrested for the same charges for which he had been arrested earlier that day.

126.     While the facts of *Padmore* case clearly include use of force and assault, no such recognition of those facts alleged is to be found in the reporting of the City to the public which is mandated by law. The failure to do so serves to demonstrate that Defendant CITY continues to under report or not report at all those instances of abuse, force, assault and other wrongful actions by its officers despite the obligation to do so.

127.     It has been the policy and/or custom of Defendant CITY to fail to take the steps to properly and fully report the allegations made of use of force, assault and battery in the Federal Cases in which the City and its officers are defendants, and has failed to take the steps to properly and fully report the allegations of unlawful search, seizure and failure to intervene in all of the cases reported.

128.     This refusal of the Defendant CITY to fully and properly report has served to create within the City a culture of denial leading to a failure to properly investigate, discipline, train, supervise or otherwise correct the improper, illegal conduct of the individual Defendants in this and in similar cases involving misconduct, thereby failing to adequately discourage further constitutional violations on the part of its Police Officers. Defendant CITY did not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct. As a result of the above described policies and/or customs, Police Officers of Defendant CITY believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated. The above policies and/or customs demonstrated a deliberate indifference on the part of policymakers of Defendant CITY to the constitutional rights of persons within Defendant CITY, and were the cause of violations of Plaintiff's rights alleged herein. As a result of the wrongful, deliberate, indifferent and illegal acts

of Defendants CITY, MORANO, ORTIZ and INSIGNARES, Plaintiff MS. PERRIEN claims damages against Defendant CITY for the injuries set forth above.

129.    In addition to permitting a pattern of unlawful conduct, Defendant CITY has failed to maintain a proper system for investigation of all incidents of unjustified acts of retaliation, physical abuse, beatings and excessive use of force by officers.

130.    Defendant CITY has failed to maintain a system of addressing physical and mental abuse, review of assault, battery, negligence, failure to intervene, unlawful search and seizure, failure to care for address the known physical and medical conditions of persons in police custody, and other violation of civil rights by Police Officers and has failed to identify the improper conduct by Police Officers and thereby failed to subject Police Officers who violate laws closer investigation, supervision or restraint, to the extent that it has become the custom of Defendant CITY to tolerate the illegal, improper and wrongful actions by Police Officers.    In addition, Defendants refusal to amend the faulty report taken from Plaintiff in a semi-conscious state is an example of Defendant CITY's failure to supervise and enforce policies that are consistent with Plaintiff's rights.

131.    By failing to properly document, properly report and fully meeting its obligation to document that types of misconduct alleged, Defendants are permitting and assisting such a pattern of misconduct, the Defendant CITY has acted under color of custom and policy to condone, encourage and promote the deprivation of Plaintiff MS. PERRIEN's Fourth, Fifth and Fourteenth Amendment rights; and Defendants MORANO, ORTIZ and INSIGNARES were encouraged by Defendant CITY to believe that their actions against the Plaintiff would be accepted without impunity, just as these actions have been so accepted to date.

132.     As a proximate cause of Defendant CITY's custom and policy of supporting and effectively promoting the very same police officer abuses which occurred against Plaintiff MS. PERRIEN, said Plaintiff was further subjected to great fear, personal humiliation and degradation, with wanton disregard for the serious harm and damage done to the physical and emotional well-being of the Plaintiff.

133.     Defendant CITY failed to adequately supervise the proper training of Defendants ORTIZ and INSIGNARES in the rules and procedures while handling civilians, and MORANO in addressing or not addressing complaints made and failing to investigate.  The failure to supervise their training, refusal to investigate, and clear failure to supervise led to the careless and unlawful conduct of Defendants MORANO, ORTIZ and INSIGNARES in handling civilians in their custody and the complaints made by civilians.

134.     Defendant CITY failed to adequately supervise the conduct of Defendants ORTIZ and INSIGNARES while having Plaintiff MS. PERRIEN in their custody on October 16, 2018 and thereafter. Defendants  ORTIZ and INSIGNARES were allowed to do anything they wanted to Plaintiff MS. PERRIEN, including abusing and harming her shamelessly. Further, the lack of supervision by Defendant CITY is what led Defendants OFFICERS ORTIZ and INSIGNARES to carry out injustices against Plaintiff MS. PERRIEN without accountability.

135.     Under color of law, the Defendant NYPD failed to discipline Defendants ORTIZ and INSIGNARES by not reprimanding or punishing Defendants ORTIZ and INSIGNARES. After Defendants ORTIZ and INSIGNARES threw Plaintiff abusively and carelessly in the back of the van, Defendants ORTIZ and INSIGNARES suffered no consequences or repercussions for their actions. After Defendants ORTIZ and INSIGNARES dragged Plaintiff MS. PERRIEN around

Queens Central Booking, Defendants ORTIZ and INSIGNARES suffered no consequences. After Defendants ORTIZ and INSIGNARES purposefully injured Plaintiff MS. PERRIEN further by slamming a door onto her surgical site, Defendants ORTIZ and INSIGNARES suffered no consequences by Defendants CITY.

136.    Further, Defendants CITY through its acceptance of the failures and actions of Defendant MORANO failed to properly investigate Plaintiff MS. PERRIEN's complaint, and thus allowed Defendants ORTIZ and INSIGNARES acts to occur without imposing any repercussion or accountability for their failure to follow proper procedure and protocol, and failing to supervise the upholding of Plaintiff's rights.

137.    Due to the municipal violations by Defendants, Plaintiff sustained physical, monetary, and emotional injuries, including, but not limited to, violation of her civil rights, damage to her emotional well-being, loss of comfort, public humiliation, public harassment, mental, emotional and physical harm and stress, costs of bringing suit, additional surgical procedures, impairment of self-esteem, mental health, and physical distress, and other injuries not yet fully ascertained. By reason of the foregoing, Plaintiff has been damaged in a sum in excess of five million ($5,000,000) dollars.

## PUNITIVE DAMAGES ARE PROPER

## AGAINST THE INDIVIDUAL DEFENDANTS

138.    The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 137 through  of this *Second Amended Complaint* with the same force and effect as though fully set forth herein.

139.     The acts of the individual Defendants were willful, wanton, malicious and oppressive and were motivated solely by a desire to harm Plaintiff, without regard to for Plaintiff's well-being, and were based on a lack of concern and ill-will towards Plaintiff. Such acts therefore deserve an award in excess of ten million ($10,000,000) dollars as punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants:

a.     On the Count One in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

b.     On the Count Two in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

c.     On the Count Three in the sum in excess of five million($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

d.     On the Count Four in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

e.     On the Count Five in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

f.     On the Count Six in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

g.     On the Count Seven in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

h.     On the Count Eight in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

i.     On the Count Nine in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

j.     Punitive damages in the sum in excess of five million ($10,000,000) dollars as well as punitive damages, costs and attorney's fees;

k.     Award attorney's fees and costs of this action to the Plaintiff pursuant to 42 U.S.C. § 1988; and

l.      Declaratory Judgment that defendants willfully violated Plaintiff's rights secured by federal and state law as alleged herein;

m.      Injunctive relief, requiring Defendants to correct all past violations of federal and state law as alleged herein; to enjoin Defendants from continuing to violate federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws;

n.      Award such other and further relief as this Court may deem appropriate.

## A JURY TRIAL IS HEREBY DEMANDED

Dated: Hempstead, New York
       October 12, 2022

                              Respectfully submitted,

                              LAW OFFICES OF
                              FREDERICK K. BREWINGTON

                    By:    */S/ Frederick K. Brewington*
                              FREDERICK K. BREWINGTON
                              *Attorneys for Plaintiff*
                              556 Peninsula Boulevard
                              Hempstead, New York 11550
                              (516) 489-6959